1                   UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
2                        HOUSTON DIVISION

3

  KENNETH DAVIDSON AND JANA            CIVIL ACTION NO.
4 DAVIDSON, INDIVIDUALLY AND           4:15-cv-00827
  ON BEHALF OF THEIR MINOR
5 CHILDREN JCD AND KSD, AND
  THOMAS FARMER,
6
  VERSUS
7
  ROCKWELL INTERNATIONAL
8 CORPORATION, ET AL.,
  _____/
9

10

11         Deposition of FAIRCHILD CONTROLS

12      By And Through Its Corporate Designee

13               PAUL J. DZIORNY

14            Frederick, Maryland

15          Thursday, May 5, 2016

16                 1:00 p.m.

17

18

19

20  Job No.: 64200

21  Pages: 1 - 109

22  Reported by:  Toni R. Thompson, RMR

1           Deposition of PAUL J. DZIORNY, held at:

2           Regus

3           5100 Buckeystown Pike, Suite 250

4           Frederick, Maryland  21704

5           240.215.6510

6

7

8           Pursuant to agreement, before Toni R.

9    Thompson, RMR, Court Reporter and Notary Public in and

10   for the State of Maryland.

11

12

13

14

15

16

17

18

19

20

21

22

1                    A P P E A R A N C E S

2     ON BEHALF OF THE PLAINTIFFS (VIA VTC)

3              MICHAEL C. PALMINTIER, ESQUIRE

4              JONATHAN MITCHELL, ESQUIRE

5              deGravelles, Palmintier, Holthaus & Fruge'

6              618 Main Street

7              Baton Rouge, Louisiana   70801

8              225.408.5228

9              mpalmintier@dphg-law.com

10    ON BEHALF OF THE DEFENDANT FAIRCHILD CONTROLS

11             CHRISTOPHER M. ODELL, ESQUIRE

12             Arnold & Porter LLP

13             700 Louisiana Street, Suite 1600

14             Houston, Texas   77002

15             713.576.2401

16             Christopher.Odell@aporter.com

17    ALSO PRESENT:

18             Gary Francis

19             Robert Jullens (via VTC)

20

21

22

1                    C O N T E N T S

2    EXAMINATION OF PAUL J. DZIORNY                    PAGE

3         By Mr. Palmintier                        5,106

4         By Mr. Odell                             104

5

6

7

8

9

10

11                    E X H I B I T S

12   Dziorny 1:          Deposition Notice          20

13   Dziorny 2:          Photograph                 74

14   Dziorny 3:          Change Notice              76

15   Dziorny 4:          Shop Visit Report          82

16   Dziorny 5:          Photographs (4)            84

17

18   (Exhibits attached to the transcript.)

19

20

21

22

1                    P R O C E E D I N G S

2                         PAUL J. DZIORNY,

3    having been duly sworn, testified as follows:

4             EXAMINATION BY COUNSEL FOR PLAINTIFFS

5    BY MR. PALMINTIER:

6         Q    Can you state your full name and your

7    business address for the record, please, sir.

8         A    My full name is Paul Joseph Dziorny, and

9    my business address is the Triumph Group at 540

10   Highland Street in Frederick, Maryland.

11        Q    And, Mr. Dziorny, what I'm going to do

12   this morning is as quickly as possible go over the

13   deposition rules with you.  We're proceeding under

14   the federal rules, but in the state courts and in

15   federal courts there tends to be uniformity as far as

16   how the depositions get done.

17             First, if I ask you something that makes

18   no sense to you, you will not offend me by saying you

19   don't understand and asking me to rephrase.  Do we

20   understand each other there?

21        A    Yes, I do.

22        Q    And also, I know that you already know

1    this, we have to ask the questions in a specific way

2    proscribed by, prescribed by the federal rules, and

3    the answers have to be out loud and not with nods or

4    body language, or anything like that.  Okay?

5          A    Okay.

6          Q    And let's see, what else?  You've had

7    experience giving depositions, of course, many times;

8    correct?

9          A    No, I've never given a deposition.

10          Q    Seriously?  Okay.  Well, then let me do a

11    little more.

12               One of the things that happens in

13    depositions, because the judge isn't present, even

14    though the Court Reporter is and it's treated as if

15    we're in court, one of the things that happens is we

16    get conversational, and what I mean by that is we

17    tend to talk over each other the way we would in

18    pleasant company.  But what I'm going to ask you to

19    do is try to remember with me not to do that, because

20    that makes it very hard for our Court Reporter to get

21    down what you said, and I give you a commitment, a

22    parallel commitment to do the same.  So let's agree,

1    shall we, that we won't, if you will, step on each

2    other's words.

3            A    I agree.

4            Q    Okay.  Let me get some quick background

5    from you.  Where were you born and raised, sir?

6            A    I was born in Queens, New York, and

7    raised in Queens as well.

8            Q    And raised there?  Say that again,

9    please.

10           A    And raised there as well.

11           Q    Okay.  And where were you educated?

12           A    In New York City at the Cooper Union, as

13   well as advanced degrees from Rensselaer in both

14   electrical and mechanical engineering.

15           Q    And what are the advanced degrees?  Are

16   they master's, Ph.D.s?

17           A    Master's degrees in each.

18           Q    Okay.  In electrical and mechanical

19   engineering?

20           A    A master's degree in electrical and a

21   master's degree in mechanical, yes.

22           Q    Excellent, yes, sir.

1           And when did you get the latter of those

2    two degrees?

3           A    Now you're asking me to remember, and I

4    don't know if I can remember that.  Approximately --

5           Q    It's okay.

6           A    Okay.

7           Q    So I didn't hear.  Approximately when?

8           A    Approximately 1984 or '85.

9           Q    And let me explain that this, especially

10   this deposition I'm not quizzing you on those things

11   and we're not evaluating you yet as an expert, so

12   you're simply presented as a corporate representative

13   and so I won't hold you to those kinds of things, a

14   date of completion of your education.  But suffice it

15   to say that you have for more than 30 years been in

16   the occupation of working as an engineer, both

17   electrical and mechanical --

18          A    More than --

19          Q    -- is that correct?

20          A    More than 40 years, yes.

21          Q    Very good.

22               Now, this deposition also needs to

1    include questions about your experience from an

2    employment standpoint.  One of the reasons for that,

3    this is what's called a 30(b)(6), we want to kind of

4    get an idea about what qualifies you to be the person

5    who's being presented as a corporate representative.

6                Did you immediately go to work for one

7    company, or is there a broad range of experiences

8    from an employment standpoint?

9         A    Two companies full time, several before

10   that.  After graduating from --

11        Q    Okay.

12        A    After graduating with a bachelor's I

13   worked for United Technologies Corporation for 20

14   years, and then I worked for Fairchild, and now

15   Triumph, for over 20 years, just over 20 years.

16        Q    Okay.  And I take it then that the reason

17   why you -- if you know, the reason why you've been

18   volunteered to provide this part of the 30(b)(6)

19   answers arises out of those 20 years' experience with

20   Fairchild?

21        A    You could say it extends beyond that,

22   because I did work on a similar, on similar machines

1    at United Technologies.  But in Fairchild I was hired

2    as the vice president of engineering, and therefore

3    was responsible for overseeing any technical efforts

4    on air cycle machines, or other manufactured

5    products.

6         Q    Okay.  Very good.

7              We'll get -- well, you know, I'm not

8    going to ask you these questions today.  I'm sure

9    there's going to be another deposition of you in your

10   role as an expert, but suffice it to say then that

11   even before you came to Fairchild you worked on ACM

12   systems?

13        A    Before I came to Fairchild I was

14   responsible -- I was the manager for all rotating

15   machinery at what was then called Hamilton Standard,

16   it's now Hamilton Sundstrand, a division of United

17   Technologies Corporation, and in that role I was

18   responsible for all air cycle machines developed by

19   Hamilton Sundstrand.

20        Q    Okay.  Understood.

21             Did you actually design -- were you the

22   lead designer on the creation of any ACMs?

1        A    I was the lead designer on the creation

2   of many air cycle machines.

3        Q    Okay.  Excellent.

4             Your current employment is with whom?

5        A    It's currently with Triumph Thermal

6   Systems Maryland, a division of the Triumph Group.

7        Q    And that is as a result of the transfer

8   of the Fairchild assets to Triumph through

9   acquisition?

10       A    Exactly, in October of last year.

11       Q    Okay.  Thank you, sir.

12            Let me ask you -- this is not designed to

13  embarrass or anything, or to upset you, but we have

14  the right to know what you did in order to prepare

15  for this deposition.  So my question, my question is

16  basically what did you do to prepare for the

17  deposition, including, for example, review of

18  documents.  I don't want to hear what your employer's

19  attorneys said to you, but I do want to know whether

20  you had a meeting.

21       A    We had --

22       Q    So let us begin.

1        A     We had several --

2        Q     Did you have a meeting?

3        A     We had several telecons.  We had a

4   meeting this morning, a brief meeting this morning.

5   I examined all available records dating back -- all

6   available records for anything that could possibly be

7   associated with the Fairchild air cycle machines.

8        Q     And among those were there documents that

9   were requested that you produce in what we'll

10  introduce, Madam Reporter, as Exhibit 1, and that is

11  the Notice of Deposition of Fairchild Controls

12  Corporation?

13            MR. PALMINTIER:  And I'm going to ask my

14  staff, we don't need to go off record yet but let

15  me -- I'm turning to my staff to ask, do we have --

16  were we able to send to Chris the documents that I'm

17  about to go over?

18            Chris, do you have those documents then,

19  sir?

20            MR. ODELL:  I don't have any documents.

21  I have not received any documents from your office,

22  Mike.

1          MR. PALMINTIER:  Okay.  Well, let's

2    troubleshoot that.  We know you received the notice,

3    though, Chris.

4          MR. ODELL:  Yeah, we got the notice on

5    Monday, Mike, together with a subpoena duces tecum,

6    and we served some objections last night and you may

7    have, you may have seen that.  Basically all we said

8    was we've produced all of the responsive documents

9    that we've got, so you should already have them, with

10   the exception of records that were reviewed by the

11   witnesses that are actually not responsive, and I can

12   explain what that means.  In preparing --

13         MR. PALMINTIER:  Yes, sir.

14         MR. ODELL:  In preparing for the

15   deposition and in responding to Plaintiffs'

16   interrogatories in this case, we have, or the

17   witnesses have reviewed numerous documents to see if

18   there were any, for example, incident reports

19   relating to Fairchild ACMs and did not find any.  We

20   have not produced the documents that do not mention

21   ACM incidents, that is to say ones that don't have

22   any relevance to the case.

1           Everything that we have that would be

2     responsive to the subpoena duces tecum that we got on

3     Monday has been produced in connection with

4     Plaintiffs' other discovery requests in this case.

5           MR. PALMINTIER:  I'm going to ask the

6     witness those questions, though.

7           MR. ODELL:  Yeah, go ahead.

8           MR. PALMINTIER:  But we need to have the

9     witness have a copy of the notice.

10          MR. ODELL:  Okay.  We haven't received

11    any exhibits from you guys, and I don't think the

12    Court Reporter has either.  And I checked my e-mail

13    maybe 15 minutes before we started today, I didn't

14    have anything from your office.  Do you know when

15    they were sent or to whom?

16          MR. JULLENS:  Yes, I just e-mailed

17    them --

18          MR. ODELL:  To whom?

19          MR. JULLENS -- before noon.

20          MR. ODELL:  To whom?

21          MR. JULLENS:  Just before noon.

22          MR. ODELL:  Who did -- I can't see who's

1    speaking.  Who did you send the exhibits to?

2              MR. JULLENS:  Hannah and you.

3              MR. ODELL:  To Hannah?  I don't have any

4    way to print out exhibits here.  We are at -- just so

5    the record is clear, we are appearing at a court

6    reporter's office in Frederick, Maryland, not at my

7    office, and so I don't have any ability to print out

8    exhibits, and I wasn't told in advance that I would

9    need to be able to print out some exhibits at the

10   facility today, or I might have been able to arrange

11   something.

12             MR. PALMINTIER:  This is all hurried and

13   is happening in the middle of trial preparation in

14   another case, so I apologize.

15             MR. ODELL:  Understood, and I'm not

16   casting blame, Mike.  I'm just explaining that I

17   haven't seen the e-mail and I don't have any

18   exhibits.

19             MR. PALMINTIER:  Also we will -- the same

20   courtesies that are extended to you will be extended

21   to you.

22             MR. ODELL:  I appreciate it.

1               MR. PALMINTIER:  We appreciate you doing

2       this.

3               What we may need to do is take a recess

4       and get the Court Reporter to print out the exhibits.

5               MR. ODELL:  How many -- Mike, do you --

6       how many exhibits have you got?  How voluminous are

7       they?

8               MR. PALMINTIER:  It's a relatively small

9       number.

10              MR. ODELL:  Like I have a copy of the

11      30(b)(6) notice.

12              MR. PALMINTIER:  Five or six.  Beg your

13      pardon?

14              MR. ODELL:  I have a copy of the 30(b)(6)

15      notice and I could hand my copy to the --

16              MR. PALMINTIER:  Let me say -- I hate to

17      interrupt.  I can't understand anything that's being

18      said and it's a complete failure, this deposition is.

19      I can't hear, things are delayed.  I mean are you

20      guys having the same problem?  I'm going to have to

21      ask every question two or three times to be able to

22      get a clear answer and I'm at a disadvantage as a

1    result of that, so --

2              MR. ODELL:  I can hear everything fine.

3    I don't know about the witness.

4              THE WITNESS:  I can hear everything fine.

5              MR. ODELL:  It may be just a technical

6    issue on your end, Mike.

7              MR. PALMINTIER:  I haven't participated

8    in setting up the technical.  Does anyone know who we

9    can call to get this straightened out?

10             (Recess 1:16-1:17 p.m.)

11             MR. PALMINTIER:  Madam Reporter, back on

12   the record.  I'll go through as much as I can and

13   struggle with the poor reception while I can.

14             (Discussion off the record.)

15             MR. PALMINTIER:  Note, Madam Reporter,

16   for the record, please, that we are having technical

17   difficulties and having difficulties understanding

18   the witness.  We offer the following options:  First,

19   to reschedule this sometime when I can show up in

20   person, or when we can get our technical difficulties

21   ironed out; secondly, we'll proceed with the

22   understanding that we're having difficulty, and that

1    will be subject to, I suppose, whatever the court

2    might allow us to do.  Bear with me.

3              We also have an ongoing matter in the

4    State District Court of Louisiana in which I'm

5    getting constant input from the court while we speak,

6    and that's not your fault, but neither is any of

7    this, but I wanted that on the record.

8              So let's go back to trying to muddle

9    through this examination.  We'll try -- I appreciate

10   Chris's suggestion.  You know, Bob's working on

11   trying to get the exhibits transferred to the actual

12   place where this is taking place.  Meanwhile, I'll

13   just go through other questions.

14             MR. ODELL:  And, Mike?

15             MR. PALMINTIER:  Yes.

16             MR. ODELL:  If it's -- again, if it's

17   helpful, I have a copy of you all's 30(b)(6) notice

18   and I'm happy to hand it to the witness if you want

19   to ask him questions about that.  I think that's

20   where you were starting.

21             MR. PALMINTIER:  That would be very

22   helpful.

1          MR. ODELL:  I just want to help.

2          MR. PALMINTIER:  I have to mute you guys

3    because we just got a note from the court in my

4    trial.  Hold one second.

5          (Recess 1:20-1:21 p.m.)

6          MR. PALMINTIER:  Back on the record.  And

7    I agree with what Chris said, this is not typical.

8    It's my fault, not yours, and all I can say is we can

9    muddle through and do the best we can, and

10   hopefully -- just now the distraction of the other

11   court, you know, just ended, so we should be free of

12   that distraction, at least.  And what's more is

13   although we normally would have sent copies of the

14   exhibits to the Reporter, for some reason that hasn't

15   been done, and we appreciate your suggesting that we

16   get them to you.  We're working on that.

17          But in the meantime, let the record

18   reflect that counsel has provided to the witness a

19   copy of the 30(b)(6) notice which is, which gave rise

20   to this deposition, and I'm going to ask the witness

21   to look at it along with me, please, and in

22   particular, Mr. Dziorny, I'm going to ask you to look

1    at the third full page.

2              THE WITNESS:  Okay.

3              MR. PALMINTIER:  And we're going to

4    introduce it as an exhibit, Madam Reporter.

5              (Dziorny Deposition Exhibit 1 was marked

6    for identification and attached to the transcript.)

7    BY MR. PALMINTIER:

8        Q    Are you there, sir, where it begins in

9    the middle, the first full paragraph actually at the

10   top of the page, Fairchild Controls?

11       A    Yes.

12       Q    Do you see that paragraph?

13       A    Yes, I do.

14       Q    Okay.  Thank you.

15             The person designated by Fairchild shall

16   be able to testify on the following.  Are you

17   qualified, sir, from your own perspective to give

18   testimony about the history of the design of the

19   particular ACM at issue?

20       A    I am qualified to tell you all I know

21   about it, yes, although -- let me start again.  I'm

22   qualified to discuss all I know about the history of

1    the particular model that was designed and

2    manufactured by Fairchild Controls.  I guess you'll

3    have to tell me what the ACM at issue is.

4          Q    Okay.

5               MR. ODELL:  And, Mike, I think we covered

6    this before we were on the record at the outset of

7    today's deposition, but Mr. Dziorny is designated as

8    Fairchild Controls Corporation's witness for purposes

9    of this deposition on the topics designated as A, B

10   and F in Plaintiffs' 30(b)(6) notice.

11              MR. PALMINTIER:  Which is Exhibit 1?

12              MR. ODELL:  Correct, and then the other

13   topics will be handled by Mr. Gary Francis.

14   BY MR. PALMINTIER:

15         Q    Okay.  Now, Mr. Dziorny, if I understand

16   your testimony correctly, you haven't been informed

17   as to what the ACM at issue is and you need someone

18   to inform you of that?

19         A    Well, I need --

20              MR. ODELL:  Objection; form.

21              THE WITNESS:  I need you to tell me what

22   the ACM at issue is that you're referring to, yes.

1    BY MR. PALMINTIER:

2        Q    I understand, but my question is a

3    broader question than that.  You haven't been told

4    that the ACM at issue is model BUR-20-ID?

5            MR. ODELL:  Object to form.

6            THE WITNESS:  I can speak to model

7    BUR-20-D, yes.

8    BY MR. PALMINTIER:

9        Q    Okay.  But this is the first you heard

10   that that's what we were -- based on your answer, I

11   submit that you're saying this is the first you've

12   heard that this is the model that you're going to be

13   asked questions about; is that true, sir?

14           MR. ODELL:  Let me interpose an objection

15   here.  Mike, we've objected consistently to

16   Plaintiffs' requests, including the interrogatories

17   in today's Notice of Deposition, with respect to the

18   phraseology the ACM at issue, or the product at

19   issue, because Fairchild has no information as to

20   whether the BUR-20 ACM was actually on the aircraft

21   on the day in question, May 31st, 2011.

22               So that's our objection, but as I think

1   the witness just said --

2          MR. PALMINTIER:  You didn't inform him --

3          MR. ODELL:  Well, I think that's for you

4   to inform him.

5          MR. PALMINTIER:  You didn't inform the

6   witness of -- well, I understand, and, you know, we

7   have a magistrate now who will be able to attend to

8   this, but I want an answer to the question from the

9   witness.

10  BY MR. PALMINTIER:

11       Q    Isn't it true, sir, that you have not

12  been told that the model in question or at issue is

13  model BUR-20-1D, or ID?  Isn't that true, sir?

14         MR. ODELL:  And I would object to the

15  extent that it calls for privileged communications

16  between counsel and the client.

17         MR. PALMINTIER:  So you're going to tell

18  the witness not to answer?

19         MR. ODELL:  I'm going to object to the

20  extent that you're asking the content of

21  attorney/client communications.  If the witness can

22  answer otherwise, he's free to do so.

1    BY MR. PALMINTIER:

2         Q    This is the first you heard that the

3    model at issue is model BUR-20-ID, isn't it, sir?

4         A    I can talk -- I can speak to the model

5    BUR-20-D.

6         Q    That's not my question, and you --

7              MR. PALMINTIER:  Please inform him that

8    he has to answer the question and then he can

9    explain.

10             THE WITNESS:  Could you repeat the

11   question, please?

12             MR. PALMINTIER:  I gave you the

13   opportunity to explain that to him, Chris.  You

14   didn't do it, that's fine.  Let's proceed.

15             MR. ODELL:  Excuse me, the witness

16   asked --

17             MR. PALMINTIER:  Are you --

18             MR. ODELL:  Excuse me, Mike.  The witness

19   asked you to clarify your question and you ignored

20   him.

21             MR. PALMINTIER:  Again, I can't hear half

22   of what you guys are saying, so.

1          MR. ODELL:  Okay.

2          MR. PALMINTIER:  The witness --

3          MR. ODELL:  Well, let me help you.  The

4  witness asked you to clarify your question.  Did you

5  hear me?

6          MR. PALMINTIER:  Did you just offer to

7  help me, which would be a first?

8          MR. ODELL:  Okay.

9          MR. PALMINTIER:  The witness just did

10  what?

11          MR. ODELL:  Look, Mike, if you're going

12  to take this opportunity to make little snarky

13  comments, we're not going to get anywhere today.  The

14  witness asked you on the record to clarify your

15  question and you ignored him and started shouting.

16  Why don't you go ahead --

17          MR. PALMINTIER:  Counsel, I

18  haven't shouted, number one --

19          MR. ODELL:  -- and ask the question

20  again.

21          MR. PALMINTIER:  -- and, number two, the

22  question was not answered.  Number three, you're

1    going to have to stop giving colloquies on the record

2    to help your witness.  He's on his own.  You don't

3    get to testify for him.  So -- and then it's

4    compounded -- the problem I have is it's compounded

5    by I can't hear what he's saying, largely because you

6    keep talking.

7              So what I suggest is let's move back to

8    the deposition, give the witness an opportunity to

9    answer the question, but you do have to instruct him

10   that he has to answer the question.

11             MR. ODELL:  Why don't you ask --

12             MR. PALMINTIER:  I'll do it again --

13             MR. ODELL:  -- your question.

14   BY MR. PALMINTIER:

15        Q    Here it is, I'll give it again,

16   Mr. Dziorny:  Today is the first time that you heard

17   that the model BUR-20-ID is the, quote, design of the

18   ACM at issue listed in Exhibit 1A that you've now got

19   in front of you; isn't that true?

20             MR. ODELL:  Well, hold on one second.

21   I'm looking at Exhibit 1 and it does not define the

22   product at issue anywhere as being the BUR-20 ACM.

1          MR. PALMINTIER:  Chris, you can keep

2     trying to prevent me from taking this deposition

3     properly, but we've already identified the exhibit.

4     The witness has already said that Fairchild Controls

5     Corporation paragraph, that he sees it.  He's also

6     been asked a question from A.  Now you're saying that

7     you don't have that in front of him?

8          MR. ODELL:  Let me be clear for the

9     record.  I am holding Plaintiffs' 30(b)(6) Notice of

10    Deposition of Fairchild Controls Corporation.  It is

11    dated May 2nd, 2016.  The first subject designated is

12    A, The history of the design of the ACM at issue.

13    Nowhere in this notice is the ACM at issue defined at

14    all.  It does not define the ACM as a BUR-20, or by

15    any other type.

16         MR. PALMINTIER:  Are we --

17         MR. ODELL:  Hold on, I'm talking.  Excuse

18    me, I am talking on the record.

19         MR. PALMINTIER:  You have to stop

20    testifying, Counsel.  No, you don't have the right to

21    do that.  This is my deposition.  What we're going to

22    do is we're going to stop.  Do you have a phone?

1    We're going to ask the magistrate whether you're

2    going to be able to destroy this deposition this way.

3                MR. ODELL:  Excuse me --

4                MR. PALMINTIER:  Let's get the magistrate

5    on the line.

6                MR. ODELL:  Wait, we are not off the

7    record.  I am going to complete my objection before

8    you call, and then you --

9                MR. PALMINTIER:  I want this to be on the

10   record.

11               MR. ODELL:  -- and then we can call

12   Magistrate Johnson.  My objection --

13               MR. PALMINTIER:  We're calling the

14   magistrate now.

15               MR. ODELL:  Excuse me, Mr. Palmintier,

16   can you please calm yourself.  My objection --

17               MR. PALMINTIER:  I'm not -- I'm upset

18   that the witness --

19               MR. ODELL:  My objection on the record --

20               MR. PALMINTIER:  -- isn't answering

21   questions and you keep talking.

22               MR. ODELL:  -- is that Plaintiffs'

1    counsel --

2              MR. PALMINTIER:  The record will reveal

3    that.

4              MR. ODELL:  Plaintiffs' counsel has

5    designated the witness to testify about the design of

6    the ACM at issue, but has not defined what that is.

7    The witness has already said he is perfectly

8    competent to testify about the BUR-20-D ACM.  But

9    that is not, that is not --

10             MR. PALMINTIER:  Wait a minute, stop.

11   Now you're testifying --

12             MR. ODELL:  -- how the Plaintiff has

13   designated this --

14             MR. PALMINTIER:  -- as a corporate

15   witness and giving him answers.  You don't get to do

16   that.  Madam Reporter, off the record.  It's my

17   deposition, we're off the record.

18             (Recess 1:31-1:39 p.m.)

19   BY MR. PALMINTIER:

20        Q    Mr. Dziorny, you know you're still under

21   oath.

22             Do you have in front of you what we have

1      now called Exhibit 1, which is the Notice of

2      Deposition which counsel was kind enough to provide?

3              A      Yes.

4              Q      Do you?

5              A      Yes, I do.

6              Q      Thank you.

7                     And I also notice that the pages are not

8      numbered, but physically if we count them there are

9      one, two, and then the third page that I was asking

10     you to look at, do you see that third page?

11             A      Yes, I do.

12             Q      And you see the Fairchild Controls

13     Corporation bold and underlined in the beginning of

14     the sentence in the first paragraph?

15             A      Yes.

16                    MR. ODELL:  Hey, Mike?

17                    MR. PALMINTIER:  Yes.

18                    MR. ODELL:  I've just been handed some,

19     what like look exhibits.

20                    MR. PALMINTIER:  Good, good.

21                    MR. ODELL:  So I'm going to -- with your

22     permission I'm going to swap out the copy of the

1   30(b)(6) notice that I was just handed by someone

2   here at the facility and give that to the witness as

3   Exhibit 1.

4             MR. PALMINTIER:  Yes.

5             MR. ODELL:  And then I'll give the rest

6   of the exhibits to the Court Reporter.  Okay?

7             MR. PALMINTIER:  That sounds good.  I'm

8   going to have to mute you guys.  Give me one minute.

9             (Recess 1:41-1:42 p.m.)

10            MR. PALMINTIER:  Counsel, the actual

11  exhibit, or that which is in front of you, but they

12  are the same, are they not, the third page has

13  Fairchild Controls, those words, beginning the first

14  paragraph, full paragraph; correct?

15            MR. ODELL:  Correct.

16  BY MR. PALMINTIER:

17       Q    And could you read that letter A under

18  that paragraph?

19       A    Yes, it says:  The history of the design

20  of the ACM at issue.

21       Q    And my question for you before was isn't

22  it true, sir, that this is the first time when I

1    mentioned a number, model number, BUR-20-1D, the

2    first time you heard that that was the number you

3    were to testify to?

4          A    I understand what you say is the ACM at

5    issue, but I do not know what ACM was on that

6    airplane.

7          Q    That's not my question, and I know you're

8    an intelligent man.  I'm going to ask you to

9    distinguish between your answer and the actual

10   question, which is isn't the first time that you

11   heard BUR-20-1D today when I mentioned it to you.

12              MR. ODELL:  Objection to form.

13   BY MR. PALMINTIER:

14         Q    That's all I'm asking, yes or no.

15         A    Could you repeat the question again?  I'm

16   sorry.

17         Q    Today was the first time that you had

18   heard model BUR-20-1D was the model at issue; isn't

19   that true?

20              MR. ODELL:  Objection; form, and it could

21   be a transmission thing.  Mike, are you saying BUR-21

22   or 20?

1          MR. PALMINTIER:  20-1D.

2          MR. ODELL:  Oh, okay.  I'm sorry, it was

3     a transmission issue, sorry.

4          THE WITNESS:  I've heard that you have

5     stated the ACM at issue is the BUR-20-1D.  I am

6     unaware of what -- I have no, I have no knowledge of

7     what air cycle machine was on the aircraft, so I

8     simply ask you what is the ACM at issue.

9     BY MR. PALMINTIER:

10         Q    See that's not the way it works.  You

11    don't ask me questions, I ask you questions, and with

12    all due respect I've asked a simple question.  Isn't

13    it true that today was the first time that you heard

14    that the ACM model BUR-20-1D was the model at issue?

15         MR. ODELL:  Objection.

16         Q    Isn't that true, sir?

17         MR. ODELL:  Objection; asked and answered

18    twice.  You can answer it again if you want to, sir.

19    You don't have to at this point.

20         THE WITNESS:  I understand that you have

21    said the BUR-20-1D is the ACM at issue, but I have no

22    knowledge of what ACM was on the aircraft.

1   BY MR. PALMINTIER:

2       Q    But, sir, I didn't ask you that.  I asked

3   you whether you had ever before today heard that this

4   is the model at issue --

5       A    I've heard --

6       Q    -- and your answer is no, isn't it?

7            MR. ODELL:  Objection; asked and answered

8   and misstates the record.

9   BY MR. PALMINTIER:

10      Q    You hadn't heard it, have you?

11           MR. ODELL:  The witness has already

12  testified that he had heard it, and he's answered the

13  question three times, Mike.  Do you want to ask him a

14  fourth?

15           MR. PALMINTIER:  We have a hearing at

16  2:30, we'll recess until then.

17           MR. ODELL:  No, no, no, no, absolutely

18  not.  No, no, we are not going off the record for an

19  hour and a half.  Are you kidding?  If you want to

20  ask questions of the witness he's here, but this is

21  counting against your time if you recess the

22  deposition at this point.

1            MR. PALMINTIER:  We have a magistrate

2    hearing at --

3            MR. ODELL:  We have incurred costs

4    putting this together.  I have flown out here, my

5    client has incurred legal fees and other costs

6    associated with this deposition, and you are making a

7    mockery of it.  This is ridiculous.  Ask your

8    questions.

9            MR. PALMINTIER:  So do you suggest that a

10   magistrate hearing that has been scheduled is a

11   mockery, sir?

12           MR. ODELL:  No, I'm suggesting --

13           MR. PALMINTIER:  Would you like to state

14   that for the record?

15           MR. ODELL:  I'm happy to have this on the

16   record.  I suggest that the fact that you have asked

17   for a video conference deposition that you are

18   technologically not able to handle, that you have

19   exhibits that you failed to send to anyone in advance

20   of the deposition, and that you are not accepting the

21   witness's testimony because you don't like the

22   substance of it, and that you now want to recess the

1    deposition for some period of time so that you can

2    complain to the magistrate about the situation that

3    you've created is making a mockery of this process.

4    Yes, sir, I am saying that, and I'm going to say the

5    same thing to the judge.

6              Now, if you have questions to ask the

7    witness, I invite you to do so.  He's ready and

8    willing and prepared to answer them.

9              MR. PALMINTIER:  No, he's not.  He may be

10   ready and willing, but you're not willing to allow me

11   to do what I'm allowed to do under the rules.

12             MR. ODELL:  Ask any question you want.

13   Ask any question you want.

14             MR. PALMINTIER:  No, I already asked the

15   question I want, and I don't seem to be able to get

16   an answer because you don't seem to be able to stop

17   talking, and that's why we need to have the

18   magistrate --

19             MR. ODELL:  Excuse me, Mike, you asked

20   the question three times.

21             MR. PALMINTIER:  I don't even get to

22   finish a sentence.  I listened to about three

1    paragraphs on this transcript from you.  Let me just

2    say for the record we will proceed, and you've

3    disagreed with me that we should recess and that's

4    fine with me, you know, but if you continue to tell

5    the witness not to answer -- you have now instructed

6    the witness not to answer, am I correct?

7            MR. ODELL:  No, the witness -- I told the

8    witness, or I objected that the answer had been, or

9    that the question had been asked three times.  I told

10   the witness he could answer it if he, again a fourth

11   time if he wanted to, and he did and the record

12   reflects it.

13           MR. PALMINTIER:  See that's -- well, if

14   the record reflects that he's given an answer, it's

15   probably instructed by you during the break that he

16   wasn't to say, wasn't to answer my question.  Let's

17   go back on the record.

18           MR. ODELL:  We've been on the record the

19   entire time.

20           MR. PALMINTIER:  You're provoking this,

21   Chris.  You got to let me ask my questions.  Madam

22   Reporter, let's go back on the record.

1    BY MR. PALMINTIER:

2          Q    Mr. Dziorny, during the break did you and

3    counsel speak?

4          A    Yes.

5          Q    Yes, and he told you what to answer, did

6    he not?

7               MR. ODELL:  Objection.  Do not --

8          Q    He told you how to answer, didn't he,

9    sir?

10              MR. ODELL:  I am instructing the witness

11   not to divulge --

12              MR. PALMINTIER:  Chris, don't interfere.

13              MR. ODELL:  -- the substance of any

14   communication between counsel and the witness.

15         Q    Didn't he?

16              MR. ODELL:  You are instructed not to

17   answer that.

18              MR. PALMINTIER:  You don't have a right

19   during the deposition to counsel a witness that's in

20   the middle of a question.

21              MR. ODELL:  There was no question

22   pending, first of all.  Second, we went off the

1    record at your request.

2    BY MR. PALMINTIER:

3        Q    I appreciate, Mr. Dziorny, your having

4    told the truth about him having told you how to

5    answer the question.

6             My next question is did he also tell you

7    how to answer the next question, B, Your

8    participation with other companies in the design of

9    the environmental control system aboard the Twin

10   Commander 690A which incorporated the Fairchild ACM,

11   during the break did he tell you what to say about

12   that?

13            MR. ODELL:  Objection.  I instruct the

14   witness not divulge the contents of any communication

15   with Fairchild's attorney.

16            MR. PALMINTIER:  So during breaks you're

17   coaching your witness, Chris?

18            MR. ODELL:  Mike, you are asking some of

19   the most patently objectionable questions I've ever

20   heard in my career.  You're asking me and the witness

21   to divulge the content of communications that are

22   privileged.

1          MR. PALMINTIER:  They're not privileged,

2     you know they're not privileged, and you're --

3     BY MR. PALMINTIER:

4          Q     Anyway, did you speak with counsel

5     about --

6          MR. ODELL:  Objection.

7          Q     -- B during the break that we just had?

8          A     Could you ask the question one more time?

9     I'm sorry.

10         Q     See number B, letter B on the first

11    paragraph --

12         A     Yes, I do.

13         Q     -- that begins, Your participation, do

14    you see that?

15         MR. ODELL:  Do you see that?

16         THE WITNESS:  I do see that, yes.

17    BY MR. PALMINTIER:

18         Q     Did you speak with counsel about that

19    during the break?

20         MR. ODELL:  Objection.  I'm going to

21    instruct the witness not to divulge the contents of

22    any communication he has had with Fairchild's

1    attorneys.

2    BY MR. PALMINTIER:

3         Q    And what about F, did you speak with

4    counsel during the break about F, Any and all patents

5    held by you or based on a design created by you for

6    the design of air cycle machines --

7              MR. ODELL:  Same instruction.

8         Q    -- during the break?

9              Okay.  Let's go back to A then.  Are you

10   familiar with a model called ACM model BUR-20-1D?

11        A    Yes, I am.

12        Q    And could you tell us what that is?

13        A    It's an air cycle machine.

14        Q    Is it an air cycle machine for general

15   purposes, or is it for use in aircrafts?

16        A    All air cycle machines are for use in

17   aircraft.

18        Q    Okay.  And are you familiar with a

19   specific example of that model called serial number

20   353?

21        A    Yes, I'm aware that there is a serial 353

22   BUR-20-1D model, yes.

1          Q     Have you seen that model --

2          A     I haven't seen --

3          Q     -- with that serial number 353?

4          A     I haven't seen serial number 353, but I

5     have seen a number of those models of air cycle

6     machines, yes.

7          Q     Did you participate in the design of that

8     machine?

9          A     No, the machine was designed starting in

10    the '40s, and the design was well completed before I

11    was born.

12         Q     Before you were born, I'm sorry?

13         A     Yes, before I was born.

14         Q     Okay.

15               MR. PALMINTIER:  Hold on just a second.

16               (Recess 1:54-1:56 p.m.)

17    BY MR. PALMINTIER:

18         Q     One of the reasons why you were listed is

19    because you could give a history of the design, and I

20    guess we're just fortunate that you indeed can talk

21    about the model BUR-20-1D.  Can you tell us who

22    designed it in the '40s, or do you know?

1       A     It was designed by engineers at

2   Fairchild, or actually at Stratos, the former, which

3   became Fairchild at some point through various

4   acquisitions.

5       Q     Okay.  Again, that was probably before

6   you were a grown man, but do you have any knowledge

7   about the company Stratos?

8       A     Sure.  Yes, I do.  I have some knowledge

9   about the company Stratos.

10      Q     Could you give us just a general overview

11  of what it was?  First, am I correct that you said it

12  was a predecessor corporation to Fairchild?

13      A     It was at least a predecessor, yes.

14      Q     Okay.  And from -- do you have any idea

15  when Fairchild became Fairchild Corporation, or

16  Fairchild Controls Corporation?

17      A     Well, Fairchild Controls -- before I was

18  brought into the corporation in 1994 I believe

19  Fairchild Controls Corporation was established as a

20  separate entity, a division of Matra-Hachette, if I'm

21  not mistaken.

22      Q     I couldn't understand you.

1　　　A　　As a division of Matra-Hachette.

2　　　Q　　Okay.  Can you spell that for me?

3　　　A　　M-a-t-r-a - H-a-c-h-e-t-t-e, I believe.

4　　　Q　　All right, sir.

5　　　　　I want you to understand that if I refer

6　　to the ACM I'm -- for purposes of this discussion,

7　　can we agree that I'm referring to this model, the

8　　one we are talking about, the BUR-20-1D?

9　　　A　　I'm happy to discuss the BUR-20-1D.

10　　　Q　　And so when I refer to the ACM, can we

11　　agree that I'm referring to that model so we don't

12　　have to say it every time?

13　　　A　　That's fine.

14　　　Q　　All right.  Thank you.

15　　　　　Are you familiar with the Twin Commander

16　　690A, the aircraft?

17　　　A　　Not at all.  Very little.  The only

18　　familiarity I having is by looking or reviewing a

19　　manual that was presented to me which showed the

20　　various systems within the Twin Commander 690A.

21　　　Q　　Okay.  And so your familiarity with it is

22　　as a result of having read a manual, your familiarity

1   with the aircraft Twin Commander 690?

2          A     That's correct.  I don't design aircraft.

3          Q     Okay.  But you do design aircraft

4   components; correct?

5          A     That's correct.

6          Q     And you design them for Fairchild;

7   correct?

8          A     Presently for Triumph, but previously for

9   Fairchild; that's correct.

10         Q     Understood.

11               Are you aware of an event that took place

12  in May of 2011?

13         A     Yes, I am.

14         Q     And you were made aware of it as part of

15  this litigation; correct?

16         A     That's correct.  That's the only way I

17  was made aware of it.

18         Q     Okay.  And so when we talk about -- I'm

19  going to call it the incident.  When we talk about

20  the incident, can we agree that we're talking about

21  the May 2011 incident?

22         A     That's fair, sure.

1      Q     Okay.  My purpose in this 30(b)(6) is to

2   indeed get from you ideas -- sorry, get from you your

3   corporation's knowledge of the history of this, of

4   the model ACM, the one we're talking about.  So you

5   mentioned that it was designed by the predecessor of

6   Fairchild.  Could you go on?  Did it stay the same,

7   or has it gone through permutations of redesign or

8   improved design?

9      A     I have knowledge of one engineering

10  change that was made for producibility in

11  approximately 1970 or '73.  It was a minor change

12  that eased some assembly issues.  But other than

13  that, the machine that's overhauled today at

14  Fairchild -- at, excuse me, at Triumph is the same as

15  was designed initially.

16     Q     The same as was designed?

17     A     Initially, the same -- it conforms to the

18  drawings that date back as early as 1941, I believe.

19     Q     Excellent, okay.

20           So as far as this particular model is

21  concerned, Stratos and Fairchild, and even Triumph

22  now, have been manufacturing them according to the

1    original early '40s design; correct?

2              MR. ODELL:  Objection; form.

3              THE WITNESS:  They've been -- it's out of

4    production now.  It's been out of production for over

5    30 years now, as best as I can estimate, but the

6    machines that we overhaul today conform to the

7    drawings that date back to the '40s and '50s.

8    BY MR. PALMINTIER:

9         Q    What is an environmental control system?

10        A    An environmental control system controls

11   the humidity, the temperature and the pressure within

12   an aircraft cabin, a cockpit and cabin of an

13   aircraft.

14        Q    And an ACM, such as the one we're talking

15   about today, is part of that environmental control

16   system, which we'll call the ECS --

17        A    It is one --

18        Q    -- do you agree?

19        A    It is one component of it, yes, I agree.

20        Q    Would you also agree, though, that it is

21   an essential component without which an environmental

22   control system for an aircraft for which this ACM was

1   designed would not be able to function?

2           MR. ODELL:  Objection; form.

3           THE WITNESS:  I would say it's not -- you

4   could have an environmental control system that

5   controls pressure within the aircraft without an air

6   cycle machine.  So is it essential?  No, not

7   necessarily.  It cools the aircraft.

8   BY MR. PALMINTIER:

9       Q    So your testimony -- go ahead.

10      A    It provides cooling.  That is its primary

11  function --

12      Q    Okay.

13      A    -- to provide cooling, as I stated in the

14  report and the declaration previously submitted to

15  you.

16      Q    And the what previously submitted?

17      A    The declaration and the report that was

18  previously submitted.

19      Q    Okay.  But, and I'm sure counsel will

20  confirm this, that's not the role you're playing

21  today.  You're the corporate representative giving me

22  answers to questions, and I'm not relying on your

1    report or your declaration to ask you these

2    questions, but I also don't want to dwell on things.

3    I do have just a few more questions about the role of

4    the ACM in the ECS.  Does that question -- does that

5    preface make sense to you, the role of the ACM in the

6    ECS?

7            A    I can tell you the role of the ACM in the

8    ECS.  Its primary function is to cool air introduced

9    into the cabin.

10           Q    Okay.  And so if -- isn't it true, sir,

11   that a well-designed ECS always has some component

12   that cools air?

13           A    It doesn't have to, but that's true, they

14   do for passenger comfort.  It's for comfort.  It's

15   not for safety or any other reason.

16           Q    Understood.

17                The ACM in question, did you participate

18   in any modifications or redesigns of that model?

19           A    The model was not redesigned, other than

20   one minor engineering change which I'd be happy to

21   describe to you.  It conforms to the original

22   drawings made between 1941, I believe, and sometime

1    in the '50s.

2         Q    Okay.  Let's then go ahead and explain

3    that design -- I think you began to explain the,

4    explain that design change that I think you said was

5    sometime in the early '70s?

6         A    It was '71 or '73, yes.  It was a minor

7    engineering change that allowed the assemblers to

8    polish the ID of a sleeve into which the bearing is

9    inserted.

10        Q    Okay.  And what was the purpose of the

11   bearings that you just mentioned?

12        A    The bearings support the rotative

13   assembly.

14        Q    Okay.  And what was the purpose of the

15   sleeve?

16        A    The air cycle machine is made as light as

17   possible and consequently aluminum is used

18   extensively.  The bearing outer race, each of the

19   bearing outer races is hardened steel and cannot be

20   inserted directly into aluminum, so a sleeve is

21   inserted in the aluminum, a steel sleeve, to protect

22   that aluminum surface.

1       Q     Okay.  And that is -- just that assembly,

2    how is it lubricated, the assembly that was modified?

3       A     The assembly is not lubricated.  The only

4    thing that's lubricated are the ball bearings within

5    the assembly, and they're lubricated identically to

6    how they were designed initially.  No changes have

7    been made related to lubrication of the ball

8    bearings.  The only change that was made was this

9    change allowing polishing of the sleeve that

10   facilitates inserting the bearings more easily.

11             It's a producibility issue more than

12   anything else.

13      Q     So that the overhauling of the ACM could

14   be facilitated; correct?

15      A     Either the overhaul or the manufacture to

16   begin with, the initial manufacture.

17      Q     Well, one of the things that you've

18   explained to us is that 30 years ago Fairchild, I'm

19   guessing it was Fairchild, stopped manufacturing this

20   particular ACM; correct?

21      A     Approximately 30 years ago, yes.

22      Q     That's one of those numbers we won't hold

Page 52

1  you to exactitude on.  We can find that out somewhere

2  in Fairchild's records; correct --

3            MR. ODELL:  Objection; form.

4      Q    -- the exact time in which it stopped

5  manufacturing?

6            MR. ODELL:  Objection; form.

7            THE WITNESS:  I don't believe that we

8  would be able --

9            MR. PALMINTIER:  I'll withdraw and

10 rephrase.

11 BY MR. PALMINTIER:

12     Q    Somewhere in Fairchild's record we could

13 find the date when it was, this machine was, the ACM

14 was discontinued in terms of manufacture; correct?

15           MR. ODELL:  Objection; form.

16           THE WITNESS:  We have looked at all the

17 records that exist, and the company does not have any

18 precise indication of the last time that unit was

19 manufactured.

20 BY MR. PALMINTIER:

21     Q    Okay.  But you give us -- you're giving

22 us a guesstimation of around 30 years ago --

                                                    Page 53

1        A     That's correct.

2        Q     -- correct?

3        A     That's correct.

4        Q     Let's talk about the reason for the

5   discontinuation of this model of ACM.  First, did you

6   participate in the decision to discontinue it?

7        A     Certainly not.  I was not an employee of

8   Fairchild Controls in approximately 1980.

9        Q     Have you familiarized yourself then with

10  the reasons that your predecessors at Fairchild

11  discontinued the use of this ACM, of the manufacture

12  of this ACM?

13             MR. ODELL:  Objection; outside the scope

14  of the designation.  You can answer.

15             THE WITNESS:  I can tell you that the

16  reason the unit, the manufacture of the unit was

17  discontinued is simply because there were no new

18  airplanes being manufactured at that time.  That

19  would be my, a very good guess as to why it was not

20  manufactured after 1980, or approximately 1980.

21  BY MR. PALMINTIER:

22             Q     And to the statement that the reason why

1   Fairchild discontinued the manufacture is because

2   they were inherently unsafe, you would say what?

3        A    I would say that there's no basis for

4   that.

5        Q    But you have heard criticisms of this

6   particular ACM in terms of its safety record, have

7   you not?

8        A    I certainly have not.

9        Q    Okay.  We'll talk about your job --

10            MR. ODELL:  Do you mean outside this

11   litigation?

12            MR. PALMINTIER:  I'm sorry?

13            MR. ODELL:  I'm sorry, did you mean

14   outside this litigation, or just in this case?

15            MR. PALMINTIER:  I'll let the answer

16   stand.

17            MR. ODELL:  Okay.

18            MR. PALMINTIER:  I'm fine with the

19   answer.

20            MR. ODELL:  Okay.

21   BY MR. PALMINTIER:

22        Q    What I'm asking, though, is -- let's go

1    back to your role, your current role for Triumph, the

2    sequelae corporation to Fairchild.  What is your job

3    now?

4          A    My job now is vice president, chief

5    engineer.

6          Q    And it's your role as vice president and

7    chief engineer to evaluate the systems that your

8    company is manufacturing; is it not?

9          A    It certainly is, yes.

10         Q    And one of your responsibilities -- one

11   of the rules you follow is you make certain that

12   there's nothing inherently unsafe about any of the

13   products that you manufacture; correct?

14         A    I am responsible for the safety of the

15   product -- ensuring that we manufacture or design, I

16   should say design and develop safe products, yes.

17         Q    And that was your responsibility when you

18   were employed by Fairchild, wasn't it?

19         A    Yes, it was.

20         Q    How long -- were you chief engineer for

21   Fairchild as well?

22         A    I was vice president of engineering at

1    Fairchild for 17 years.

2         Q    I'm sorry, the technological problem just

3    recurred.  Would you restate that answer?

4         A    Sure.  I was vice president of

5    engineering for Fairchild Controls for 17 years.

6         Q    Did you also have, as you just described

7    for us, the moniker of chief engineer while you were

8    at Fairchild?

9         A    For two, two and three-quarters years,

10   yes, I did.

11        Q    And was that toward the end of your, of

12   the existence of Fairchild as it became --

13        A    It was --

14        Q    -- Triumph?

15        A    No, it really had nothing to do with

16   that.  It had to do with a new president coming into

17   Fairchild.

18        Q    Okay.  And was that just a change in the

19   words used to describe the job title, or did the job

20   change when you became chief engineer two and a half

21   years before?

22        A    The job changed.

1    Q    Okay.  What additional responsibilities

2    did you have?  What additional rules did you have to

3    follow?

4              MR. ODELL:  Objection; form.

5              THE WITNESS:  I didn't have additional

6    rules, I had new rules to follow.  I was responsible

7    for development of new designs, not the day-to-day

8    operation of the engineering group.

9    BY MR. PALMINTIER:

10    Q    Okay.  Well, wasn't there a chief

11    engineer before you at Fairchild?

12    A    No, there wasn't.  The new president --

13    the president, when he arrived, created that role.

14    Q    Understood.

15              What was your role as -- I'm sorry, your

16    job description before they added chief engineer

17    was --

18    A    Vice president --

19    Q    -- vice president?

20    A    -- of engineering.

21    Q    What was your job for those 17 years

22    while you were vice president of engineering for

1    Fairchild?

2         A    I was responsible for all engineering

3    operations, design and development, as well as

4    production follow-up.

5         Q    Did Fairchild design a new ACM after it

6    discontinued the manufacture of the ACM in question?

7         A    No.

8         Q    Same reason, that small planes weren't

9    being made?

10        A    No, they changed -- they no longer --

11   they decided they were no longer making air cycle

12   machines.

13        Q    Okay.  And -- but they continued to

14   maintain the air cycle machines they designed and

15   built; correct?

16        A    Yes.

17        Q    And that's since before you came, at

18   least as far as you know since before you came to

19   Fairchild they did the same; correct?

20        A    Yes.

21        Q    And certainly when you got there 17 years

22   before you went to Triumph this maintenance of the

1     existing product was done; correct?

2          A     For my entire career at Fairchild

3     Fairchild has overhauled and repaired existing, or

4     air cycle machines that were designed by Fairchild,

5     or Stratos at the time.

6          Q     From an engineering standpoint, can you

7     describe to the jury what the nature of the

8     overhauling system of component parts of aircrafts is

9     like, what it is?

10               MR. ODELL:  Objection; form.

11               THE WITNESS:  I'm not sure I understand

12     your question.  I'd be happy --

13               MR. PALMINTIER:  I'll withdraw.  Yes,

14     I'll withdraw, and if we were physically present I

15     would -- you know, this would go more quickly, this

16     kind of withdrawal, but I agree that that was not a

17     clear -- this is what we were talking about earlier,

18     if I say something that doesn't make sense I

19     certainly am not offended by your telling me so.  Let

20     me try to rephrase.

21     BY MR. PALMINTIER:

22          Q     I'm a layperson in this regard, and

1   especially relative to the engineering, but in this

2   case I've observed and become familiar with the idea

3   that components of small aircraft are often cycled

4   through the aircraft, if you will, the world of small

5   aircrafts, so that, for example, an air cycle machine

6   might be withdrawn from a plane but an overhauled one

7   placed in, and the one that was withdrawn put into a

8   cycle of overhauling, maintenance and repair.

9           Am I incorrect about that as part of the

10  system for small craft, aircraft?

11      A    If -- no, you're not incorrect in that if

12  a part is not functioning properly it is removed from

13  an aircraft, it is sent to a certified repair

14  station, an FAA certified repair station, and it is

15  properly repaired, overhauled as required --

16      Q    Understood.

17      A    -- and a operational unit replaces it in

18  the system.

19      Q    Okay.  During the time that you were VP

20  of engineering, did you participate in the

21  methodology for cycling those, or circulating those

22  overhauled parts through the industry, through small

1    aircraft?

2            MR. ODELL:  Objection; form.

3            THE WITNESS:  I was responsible for

4    providing any assistance required to overhaul, to

5    properly overhaul any of our components.  But in

6    reality, there was never a problem overhauling, or

7    any change required in the last 20 years associated

8    with any air cycle machine made by Fairchild or

9    Stratos.

10   BY MR. PALMINTIER:

11       Q    So if understand your answer correctly

12   then, you would expand by saying no ACM that

13   Fairchild manufactured and that was part of this

14   overhaul and repair system ever was reported to have

15   contributed to a failure, a fume event in a cabin of

16   a plane?

17       A    I did not say that at all, but --

18       Q    Well, I didn't mean to put words in your

19   mouth.  I thought that's what you had said.  I'm

20   wrong about that?

21       A    What I said is that --

22       Q    Explain that.

1          A     What I said is that I was responsible, I

2     am -- I was responsible for any follow-up actions

3     required if any issue existed with the overhaul and

4     repair of any Fairchild equipment.

5          Q     And that over 20 years there was no

6     problem with the ACM?

7          A     There was no, there was no repair or

8     overhaul issue associated with it.  In other words,

9     the processes used were perfectly acceptable and

10    there were no problems associated with repair and

11    overhaul; correct.

12         Q     I understand now.

13               Is it correct to say that a routine

14    problem that was, that gave rise to the removal of an

15    ACM from these aircraft for overhauling was, the

16    allegation anyway on the part of the customer, that

17    it was giving rise to fume events in the ECS of the

18    various planes that it was a part of?

19               MR. ODELL:  Objection; form.

20               THE WITNESS:  I have no -- after

21    reviewing all records and during my experience, I

22    have never heard of a problem whereby one of the ACMs

1   has caused a fume event other than through this

2   litigation.

3   BY MR. PALMINTIER:

4        Q    The May 2011 event; correct?

5        A    This, of this lawsuit, yes.  That's the

6   first time I was informed of any issue associated

7   with the BUR-20 ACM.

8        Q    But is it fair to say that one reason

9   that may be is because no one told you about the fume

10  events, or would that not have been something that

11  you would have been concerned with?

12           MR. ODELL:  Objection; form.

13           THE WITNESS:  If there was a fume event

14  I'm sure it would have been reported through our

15  product support group and it would have been brought

16  to my attention, as any problem, any issue with any

17  of our equipment would be brought, would have been

18  brought to my attention.

19  BY MR. PALMINTIER:

20       Q    And so in your role as corporate

21  representative and the provider of the history of the

22  design of what we've now called the ACM at issue, and

1   we've defined it for you, in your role as a person

2   giving testimony about the history your testimony is

3   other than this May 2011 event you had not been told

4   of, and should have been told of, any other fume

5   events pertaining to the ACM?

6          A    I have not been --

7          Q    -- correct?

8          A    -- told of any other events; that's

9   correct.

10         Q    Okay.  In your previous employment with

11  other engineering firms, could you tell us whether

12  you participated in the design of any environmental

13  control systems for small aircraft, or any kind of

14  aircraft?

15         A    In my previous employment I participated

16  in many design and development efforts for

17  environmental control systems of small aircraft, as

18  well as very large aircraft.

19         Q    Okay.  And when you did that, among --

20  that is when you participated in the design of an

21  ECS, one of the things that you were responsible for

22  was the placement of devices such as ACMs which

1    contributed to the conditioning of the air in the

2    aircraft; correct?

3        A    I designed the air cycle machines, yes.

4        Q    And you designed them as part of the

5    overall environmental control system; correct?

6        A    My previous employer had an entire ECS

7    group that designed the entire system, and I was

8    responsible for that machine, yes.

9        Q    Let's talk about then that role before

10   the Fairchild role.  Had you ever heard criticism of

11   the ACM of the kind that Stratos designed and

12   Fairchild continued to manufacture when Stratos

13   became Fairchild?

14               MR. ODELL:  Objection; form.

15               THE WITNESS:  If you could explain

16   further.  If you mean oil-lubricated air cycle

17   machines, I can speak to that.  Is that your

18   question?

19   BY MR. PALMINTIER:

20       Q    Yes.  Thank you.

21       A    Okay.  There were many oil-lubricated air

22   cycle machines that were manufactured by United

1    Technologies Corporation, and I was indeed

2    responsible for mostly follow-up but even some new

3    machines that were oil-lubricated air cycle machines.

4    So, yes, I have experience with them.

5         Q    One of the things that you were concerned

6    with when you designed a system, an ECS that

7    contained an ACM, was concern over potential fume

8    events; right?

9         A    Not at all, no, because every single

10   oil-lubricated air cycle machine is vented to an

11   internal cavity that exhausts to the ambient air, so

12   there's no -- unless the machine actually fails,

13   unless the bearings fail fumes cannot come, go into

14   the air that gets into the cockpit and cabin.

15        Q    But what if the bearings do fail, then it

16   can get into the cockpit; correct?

17        A    Certainly it can.  It's a very quick

18   event that occurs when the unit fails, and it happens

19   in less than a second typically, and, yes, it does,

20   it does -- oil does leak.  Usually it happens so

21   quick that it's not a fuming event, it's a liquid

22   spewing event.

1        Q    Well, when I take your deposition again

2    as an expert what we'll do is we'll get into those

3    details.  But for our purposes we're talking about

4    the history that, the history of the ACM at issue,

5    and my question is did you ever incorporate a

6    Fairchild manufactured ACM into the ECS that you

7    designed for your previous employer.

8        A    Did I -- let me make sure I understand

9    the question.  Did I ever incorporate a Fairchild ACM

10   into a United Technologies Corporation system, is

11   that the question?

12       Q    Yes.

13       A    Never.

14       Q    Yes.

15       A    No, never.

16       Q    And that's because you -- I'm sorry.

17            And that's because United Technologies

18   manufactured all of the components of its ECS?

19       A    Not all of the components, but the heart

20   of an ECS is typically taken to be the air cycle

21   machine, and therefore it was closely controlled by

22   United Technologies.  We manufactured --

1      Q    You agree with --

2      A    Sorry.

3      Q    I'm sorry.  Go ahead.

4      A    No, we would manufacture --

5      Q    I interrupted.

6      A    United Technologies manufactured their

7    own air cycle machines for their systems.

8      Q    Okay.  You would agree with me, would you

9    not, though, that when they did manufacture those

10   ACMs they did so with consideration for the entirety

11   of the ECS?

12           MR. ODELL:  Objection; form.

13   BY MR. PALMINTIER:

14      Q    In other words, it was important that the

15   design of the entire ECS be compatible with that ACM

16   that they had manufactured?

17      A    The ACM was certainly compatible with the

18   system and met requirements that were posed by the

19   system engineers within United Technologies

20   Corporation; that's correct.

21      Q    Okay.  Then when you were at United

22   Technologies, am I correct in saying that you

1    actually designed specific ACMs?

2         A    Yes.

3         Q    Did you ever design an ACM that was

4    identical to, or nearly identical to, the ACM in

5    question that we referred to in letter A and that

6    we've now defined as the specific ACM in question?

7         A    I don't know what you mean by identical

8    or nearly identical.

9         Q    Well, let me rephrase it then.  Did you

10   ever manufacture -- I mean did you ever design an ACM

11   that was anywhere near the same as this subject ACM

12   in terms of its mechanism and manner in which it

13   operated?

14              MR. ODELL:  Objection; form.

15              THE WITNESS:  Yes, the configuration of

16   all air cycle machines, especially oil lubricated, is

17   essentially the same.  Sizes are different,

18   components are different, but the base configuration

19   is similar.

20   BY MR. PALMINTIER:

21        Q    Okay.  So from a historical standpoint

22   regarding this ACM that we're talking about, you

1    helped manufacture -- sorry, you helped design

2    similar ACMs?

3         A    Yes, they work -- the state of the art,

4    up until approximately the late '60s, involved

5    oil-lubricated air cycle machines, and they are all

6    similar in design, yes.

7         Q    Now, you've heard the criticism that this

8    type of ACM that we're talking about today has a

9    danger inherent in it in that it processes bleed air,

10   it moves bleed air through its system; correct?

11             MR. ODELL:  Objection; form.

12             THE WITNESS:  You said an inherent -- I'm

13   sorry, could you repeat that last phrase?  Inherent

14   criticism or -- I didn't quite get that.

15             MR. PALMINTIER:  No, no, I'll rephrase.

16   BY MR. PALMINTIER:

17        Q    Your role as the historian is really what

18   I'm trying to get at.  As the person that Fairchild

19   has presented to us to explain the history, I'm

20   asking you, the history of this ACM, I'm asking you

21   whether you had no knowledge that there were inherent

22   criticisms of this ACM among other reasons because it

1    relied on bleed air, a thing that's called bleed air,

2    did you not know that?

3              MR. ODELL:  Objection; form.

4              THE WITNESS:  No, every single air cycle

5    machine uses bleed air.  It does today, it did 30

6    years ago.  That's how it functions.

7    BY MR. PALMINTIER:

8         Q    And what is the risk of using bleed air?

9              MR. ODELL:  Objection.

10        Q    Are there no risks?

11             MR. ODELL:  Objection; outside the scope

12   of the deposition notice.  You can answer.

13             THE WITNESS:  The risk of using bleed air

14   is that the engine could introduce something in the

15   bleed air that's not desirable, I'm sure.

16   BY MR. PALMINTIER:

17        Q    From an historical standpoint, when you

18   were working for Fairchild were you not concerned

19   about the possibility of that something being

20   processed through the air cycle machine and pushed

21   into the cabin and cockpit?

22             MR. ODELL:  Same objection.

1           THE WITNESS:  No, I was not concerned.

2    There is no other way to pressurize an aircraft other

3    than using bleed air or a external compressor.

4    BY MR. PALMINTIER:

5           Q    Why did you all choose not to use

6    external compressors at Fairchild when it came to air

7    cycle machine and air used to feed the ECS?

8           MR. ODELL:  Objection; form.

9           THE WITNESS:  Well, you just said at

10   Fairchild.  We did not design, or while I was at

11   Fairchild I was never involved in the design of a new

12   air cycle machine.

13   BY MR. PALMINTIER:

14          Q    If you had designed one -- and again I'm

15   talking about the history at Fairchild now.  It's

16   fair to say that you would have considered, at least,

17   as the vice president of engineering the use of an

18   external source as you've described; correct?

19          MR. ODELL:  Objection; outside the scope

20   of the designation.

21          THE WITNESS:  No, because the technology

22   involved to drive a compressor at high speeds didn't

1    exist until the late '80s, and was actually never

2    introduced until beyond the year 2000 simply because

3    a motor cannot drive a compressor to the speeds

4    required.

5    BY MR. PALMINTIER:

6          Q    Okay.  Have you ever heard of a man named

7    Peter Schiff?

8          A    No, I haven't.

9          Q    All right.  Let's go to F on the, on

10   Exhibit 1.  Are you aware of any patents that are

11   held by Fairchild Controls Corporation for design of

12   an air cycle machine?

13         A    We -- the company searched for any

14   patents associated with air cycle machines and we did

15   not find any.  So we searched all available records

16   and found no indication of a patent of a Fairchild,

17   for a Fairchild air cycle machine.

18         Q    So just out of curiosity, Mr. Dziorny,

19   the machine that had been manufactured by Fairchild

20   and then was maintained by Fairchild had no patents

21   on it?

22         A    Not to the knowledge -- not to my

1    knowledge.  Not to the knowledge of the company;

2    correct.

3         Q    Okay.  Bear with me.

4              MR. PALMINTIER:  I'll offer and introduce

5    Exhibit 2, a photograph of the aircraft that was

6    involved in the fume incident in May of 2011.  Madam

7    Reporter, it's the only picture of an airplane.  Do

8    you see it?

9              THE COURT REPORTER:  Yes.  Do you want me

10   to mark it?

11             MR. PALMINTIER:  As Exhibit 2, yes,

12   ma'am.

13             (Dziorny Deposition Exhibit 2 was marked

14   for identification and attached to the transcript.)

15   BY MR. PALMINTIER:

16        Q    Okay.  I know you've already mentioned

17   that you had little or no experience with the Twin

18   Commander 690A, but let me just ask you for

19   completeness sake, have you ever seen this particular

20   aircraft?

21        A    Not to my memory.  Have I actually seen

22   one of these?  No.

1      Q    Okay.  So from the standpoint of the

2  history of the ACM in question, I take it that your

3  answer would be that you're unfamiliar as to whether

4  or not an ACM, the subject ACM, the model BUR-20-1D

5  or 20-ID, you have no idea whether such an ACM was

6  aboard this aircraft?

7           MR. ODELL:  At what time?

8           MR. PALMINTIER:  At any time.

9           THE WITNESS:  Have I -- I've never seen

10 one on this aircraft.  I do know that they were, that

11 they're made for -- at least they're one of the air

12 cycle machines that's made for this aircraft.

13 BY MR. PALMINTIER:

14     Q    Okay.  And which one is that?

15     A    Well, the BUR-20-1D is known to fit into

16 that system.  I've reviewed -- as I stated earlier,

17 I've reviewed the, oh, the aircraft or system manual

18 and it calls out a Stratos BUR-20-1D as part of the

19 system.  It shows pictures of what looks to be a

20 BUR-20-1D.

21     Q    Okay.  But again, you've never seen one

22 of these aircraft and you certainly didn't inspect

1     the one in Exhibit No. 2; correct?

2          A     That is correct.

3          Q     Bear with me just a moment.

4               MR. PALMINTIER:  Madam Reporter, we sent

5     you -- and again my apologies in the delay in getting

6     these to you -- a document that says Change Notice at

7     the top.  Do you see that?

8               MR. ODELL:  Do you mind if I look for it,

9     Mike, while the Court Reporter types?

10              MR. PALMINTIER:  Not at all.

11              MR. ODELL:  I got it.  Fairchild 72, is

12    that it?

13              MR. PALMINTIER:  That is correct.  Let's

14    call this Exhibit 3.

15              MR. ODELL:  I'll be your legal assistant.

16    I won't even charge you for it, Mike.

17              MR. PALMINTIER:  Let's call it Exhibit 3.

18    I expect a bill in the mail, Chris.

19              (Dziorny Deposition Exhibit 3 was marked

20    for identification and attached to the transcript.)

21    BY MR. PALMINTIER:

22          Q     Exhibit 3, and have you ever seen this

1    document before, sir?

2         A    Yes, sir, I have.  This is the

3    document --

4         Q    Did you review it in preparation --

5         A    Not --

6         Q    Did you review it in preparation of the

7    deposition?

8         A    I reviewed it in preparation, in putting

9    together all of the documents associated with the

10   BUR-20-1D; correct.

11        Q    I'm sorry, that was literally -- that

12   last thing, associated with?

13        A    With the BUR-20-1D.

14        Q    Okay.  So you actually found this

15   document in a search, or someone found it for you?

16        A    One of the -- one of my associates put

17   together all of the drawings, and this is one of

18   those drawings.

19        Q    What is Exhibit 3?

20        A    It is a Change Notice.

21        Q    What is a Change Notice?

22        A    A Change Notice is a supplement to a

1    drawing that's carefully controlled and becomes part

2    of the build definition or repair definition of any

3    component.

4         Q    Okay.  Now, this particular one in

5    Exhibit 3, can you tell us laypeople what this means,

6    what it means?

7         A    Yes, it's if -- it means that the

8    mechanic is permitted to polish the ID of the sleeve

9    that holds the bearing if required to allow the

10   bearing to slide freely.

11        Q    This is that change that you told us

12   about earlier --

13        A    That's exactly right.

14        Q    -- in your deposition?

15        A    Yes, it is.

16        Q    And this enabled -- the polishing enabled

17   the easier return of overhauled bearings, or fresh

18   bearings into the sleeve; correct?

19        A    It facilitates installation of the

20   bearing into the sleeve, if required.

21        Q    The reason why -- I'm sorry.  The reason

22   why bearings have to be replaced is because they wear

1    out; correct?

2          A     Yes, they're wear-out items.

3          Q     Okay.  Let me ask you again from a

4    historical standpoint, and as the chief engineer and

5    vice president of engineering for Fairchild for 20

6    years, are you aware of other designs of air cycle

7    machines?

8              MR. ODELL:  Objection; form.

9              THE WITNESS:  Okay.  Fairchild is not

10   involved in the design of air cycle machines anymore.

11   If you're asking --

12   BY MR. PALMINTIER:

13         Q     Yes.

14         A     If you're asking if I am aware of

15   alternate designs compared to oil-lubricated designs,

16   I certainly am.  I designed numerous machines that

17   weren't oil lubricated.

18         Q     Okay.  What is the alternative design to

19   that --

20         A     Well, there are actually --

21         Q     -- the ones that --

22         A     There are actually two, air bearings and

1    magnetic bearings.

2          Q    Okay.  Let's talk about air bearings.

3    How does that differ from the subject ACM that we've

4    been talking about?

5          A    It's a far different configuration with

6    new technology developed probably in the late '70s

7    for increased reliability and reduced maintenance.

8          Q    Okay.  And you actually incorporated this

9    new technology into some of your own designs that you

10   did at United Technologies?

11         A    We developed new designs using air

12   bearings in my previous life at United Technologies;

13   correct.

14         Q    Okay.  But I -- and if I asked you this

15   already, I apologize, this is a different angle.  But

16   by the time you got to Fairchild they weren't

17   manufacturing new ACMs anyway; correct?

18         A    They were not designing or manufacturing

19   new air cycle machines; correct.

20         Q    Okay.  So you were never called upon to

21   evaluate the design that had been done 30 years

22   before by Fairchild's predecessor corporation?

1       A     Because we never had any problems with

2    them.

3       Q     But the answer is no --

4       A     I was never --

5       Q     -- you were never called upon?

6       A     What was the question, was I called upon

7    to -- could you please repeat?

8             MR. PALMINTIER:  Yeah, read it back,

9    please, ma'am.

10            (Record read.)

11            THE WITNESS:  Not until this litigation.

12   BY MR. PALMINTIER:

13      Q     Okay.  But see one of the things I try to

14   do is get an answer and then have an explanation.  So

15   the answer is no, not until this litigation; correct?

16      A     That's correct.

17      Q     Okay.

18            MR. PALMINTIER:  The next document, Madam

19   Reporter, has the word Fairchild Controls at the top

20   and it's called a Shop Visit Report.

21            MR. ODELL:  Is this Exhibit 4, Mike?

22            MR. PALMINTIER:  I beg your pardon?

1           MR. ODELL:  Exhibit 4, you want this as

2    the next exhibit?

3           MR. PALMINTIER:  Yes, please, Exhibit 4.

4           (Dziorny Deposition Exhibit 4 was marked

5    for identification and attached to the transcript.)

6    BY MR. PALMINTIER:

7      Q    Okay.  Have you ever seen this document

8    before, Exhibit 4?

9      A    Let's see, this was on 353.  Yes, I have

10   seen this, yes.

11     Q    Okay.  How did you see this?

12     A    It was brought to my attention at the

13   time that I started becoming involved in this

14   litigation.

15     Q    Okay.  Who brought it to your attention?

16     A    I believe Gary Francis, the director of

17   product support, shared it with me.

18     Q    And Mr. Francis is the other corporate

19   designee that was there earlier; correct?

20     A    That's correct.

21           MR. ODELL:  And, Mike?

22           MR. PALMINTIER:  Yes.

1          MR. ODELL:  If I could, you can ask the

2     witness whatever you want.  I wanted to make sure you

3     heard me before when I said that Mr. Francis would be

4     our designee on topic C.  I don't know if you're

5     getting into that now and you're free to ask the

6     witness whatever you want about this document.  I

7     just wanted to make sure that you recognize that he

8     was not our designee on topic C, which has to do with

9     overhauls.

10          MR. PALMINTIER:  Okay.  Thanks, Chris, I

11     won't get into it, other than as it relates to A.

12          MR. ODELL:  That's fine.

13          MR. PALMINTIER:  But we can save some

14     time, I'm sure.

15          I also sent the pictures that Chris was

16     kind enough to send us earlier in the week.  It's

17     Fairchild 1343, 44, 45 and 46.  Do you see those,

18     Madam Reporter, and, Chris, do you see those?

19          MR. ODELL:  Yeah, do you want me to mark

20     them separately, or together?  How do you want to do

21     it?

22          MR. PALMINTIER:  I would like to offer

1    them as in globo Exhibit 5, and because they bear the

2    Bates numbers that you kindly provided when you

3    provided these photographs.

4                MR. ODELL:  I'm going to staple them

5    together, is that all right?

6                MR. PALMINTIER:  Yes, please.  So these

7    Bates-numbered photographs will be Exhibit 5.

8                (Dziorny Deposition Exhibit 5 was marked

9    for identification and attached to the transcript.)

10   BY MR. PALMINTIER:

11        Q    Mr. Dziorny, have you seen these

12   photographs before?

13        A    If not these, very similar, yes.  I'm

14   familiar with --

15        Q    And I'm not going to --

16        A    Go ahead, I'm sorry.

17        Q    Okay.  What do they depict?

18        A    The model, the model BUR-20-1D air cycle

19   machine.

20        Q    Which is the one that we've defined for

21   purposes of this deposition as the subject ACM;

22   correct?

1      A    Correct.

2      Q    Now, were you present when these

3 photographs were taken?

4      A    I have taken photographs myself as part

5 of this.  I might have actually taken some of these

6 photos.

7      Q    What was the reason for photographing

8 this particular model, do you know?

9      A    As part to explain various parts of the

10 report that was prepared, or the declaration.

11      Q    Could you repeat that answer?  It broke

12 up.

13      A    I took photos of the air cycle machine as

14 part of the explanation included in the report and

15 the declaration that I prepared.

16      Q    But from the standpoint of our purposes

17 in this 30(b)(6) deposition, you would agree that

18 this photograph represents a photographic

19 representation of model BUR-20-1D; correct?

20      A    Yes; correct.

21      Q    And this particular object, which is seen

22 in these four photographs, was a Fairchild

1    manufactured ACM; correct?

2          A    Yes, a Stratos or Fairchild; correct.

3          Q    Okay.  But let's look back at Exhibit 4.

4    I agree with Chris, it would be better for me to ask

5    Mr. Francis more detailed questions, but generally

6    does the vice president of engineering have a

7    responsibility to look at documents like this on a

8    regular basis from a quality control standpoint?

9          A    No, not at all.

10         Q    Okay.  So it is most likely you wouldn't

11   have seen this until it was shown to you as an aspect

12   of this litigation?

13         A    That's correct.

14         Q    Have you ever seen such a document

15   before?

16         A    Sure, numerous.

17         Q    And you were vice president in charge of

18   engineering on the date that this particular Shop

19   Visit Report was created; correct?

20         A    Yes, I was.

21         Q    But if I understand your testimony

22   correctly, it wouldn't have been shown to you as a

1    matter of course, it wouldn't have been routinely

2    shown to you?

3         A    It would not have been shown to me,

4    because there is no reason to show -- there's no

5    reason to show this report.  There's no reason to get

6    engineering involved, and therefore it wouldn't have

7    been shown to me.

8         Q    Who then at Fairchild Controls would get

9    involved with such a Shop Visit Report?

10        A    Product support, Mr. Gary Francis, the

11   director of product support, would be involved with

12   this.

13        Q    And so would this document be contained,

14   for example the hard copy of it, in a file in his

15   office or in his area?

16             MR. ODELL:  Objection; form.

17             THE WITNESS:  You would have to ask him

18   that.

19             MR. PALMINTIER:  We will, thank you.

20   That's Exhibit 4.  Give me a moment.

21             Can we go off the record for a moment for

22   a quick bathroom break?

1          MR. ODELL:  Yep.

2          (Recess 2:56-3:11 p.m.)

3          MR. PALMINTIER:  Back on the record.

4    You're still under oath.

5    BY MR. PALMINTIER:

6          Q    Let me ask you, in the capacity as the,

7    I'm going to call you the Fairchild historian in this

8    deposition, do you know how much exchange occurred

9    between the assembler of the aircraft, which is the

10   Twin Commander that I showed you a picture of in

11   Exhibit 2, do you know the extent to which Fairchild

12   participated in the overall design of the air cycle

13   machine -- sorry, in the overall design of the

14   environmental control system of that plane?

15         A    We have -- we've looked to see if we can

16   find any records associated with that.  All we found

17   is records indicating that we supplied the primary

18   and secondary heat exchanger and the air cycling

19   machine.  So I have no -- the company has no records

20   indicating that we were or were not involved in the

21   system design.

22         Q    So as the person designated as the

1    historian for FCC, Fairchild Controls Corporation, if

2    you were called upon to testify you could not answer

3    one way or the other whether Fairchild actively

4    participated in the overall design of the

5    environmental control system in Exhibit 2, the 690,

6    or whether it did?

7              MR. ODELL:  Objection; form.

8        Q    Whether it did or it did not?

9              MR. ODELL:  Objection; form.

10             THE WITNESS:  I couldn't say.  All I can

11   tell you is that we looked at all the available

12   records and we see no indication that Fairchild

13   participated in the system design.

14   BY MR. PALMINTIER:

15       Q    One way or the other, either did

16   participate or didn't participate --

17       A    That's correct.

18       Q    -- correct?

19       A    That's correct.

20       Q    Okay.  In searching the history of the

21   role of this ACM that we've been talking about in the

22   aircraft in Exhibit 2, searching that history were

1    you able to find the design specifications submitted

2    by the manufacturer of the Twin Commander to

3    Fairchild?

4         A    No, there were no records indicating any

5    specification.

6         Q    Okay.  Along those same lines let me ask

7    you some quick questions of do you know whether or

8    not in this Exhibit 2 aircraft this particular ECS

9    was adapted to accept the Fairchild ACM or the other

10   way around, the ACM designed to fit the ECS?

11        A    I really have no knowledge of that one

12   way or the other.  The only knowledge I have is that

13   the only components that appear to be in the system

14   are those two.  Every other component is not a

15   Fairchild part number.

16        Q    Okay.  As you sit here today, do you

17   believe that you are the most qualified person at the

18   former FCC to provide this historical information --

19        A    Yes.

20        Q    -- or is there somebody who knows more

21   than you do?

22        A    There is really nobody who has more

1    knowledge, especially of rotating machinery in

2    general.

3         Q    Okay.  In your experience with United

4    Technologies, when you designed some of the ACMs was

5    there someone, any individual that from your

6    perspective was the most knowledgeable engineer on

7    design of ACMs?

8              MR. ODELL:  Objection; form.

9              THE WITNESS:  Yes, that's why I was

10   promoted to manage all rotating machinery.

11   BY MR. PALMINTIER:

12        Q    Because you had that knowledge?

13        A    I worked at Pratt & Whitney initially,

14   and then was brought in to work on rotating

15   machinery, yes.

16        Q    The good thing about depositions is you

17   don't have to worry about being immodest.  This is on

18   the record because you've been submitted, but I

19   appreciate your modesty.

20             When we look at Exhibit 3, that's the

21   Change Notice --

22        A    Yes.

1      Q    -- it's fair to say that Fairchild, you

2   know, that it was Fairchild that was evaluating and

3   approving this change; correct?  Or am I wrong about

4   that, Fairchild or Stratos?

5      A    It was actually Stratos at this time in

6   '73, and Fairchild Hiller Stratos Western is noted on

7   the Change Notice, and, yes, we would have been the

8   only -- they would have been the only engineering

9   group that would look at it.  Or not only look at it,

10   but create it.  It's essentially a drawing that

11   provides definition of a machine.

12      Q    Okay.  Is this the kind of thing that

13   engineers in aircraft design and component design do

14   on a routine basis, that is maybe a practical

15   solution to a problem pops up and they evaluate it

16   and approve it, like was done in Exhibit 3?

17      A    Certainly, because a mechanic cannot

18   perform any operation that's not specified on the

19   drawing.  So if the mechanic had trouble he would

20   have contacted engineering, and engineering would

21   have to initiate any change and then create a change

22   such as this allowing him to perform an operation.

1    It's very strictly controlled.  You cannot do

2    anything -- the mechanic cannot do anything on a

3    component unless it's specifically called out or

4    specified on a drawing.

5        Q    And among other things, that's the

6    basis -- the basis of that rule that you just talked

7    about is that good engineering principles require it;

8    correct?

9        A    Yes.

10        Q    That common sense require, especially

11   when you're dealing with aircrafts and the extreme

12   damage that can occur when they don't function

13   properly; correct, common sense plays a role --

14        A    Sure.

15        Q    -- correct?

16        A    Yes.  It's very carefully controlled.

17        Q    And the federal government, in its

18   regulations of aircraft and the use of the airways,

19   also plays a role in that rule in requiring it;

20   correct?

21            MR. ODELL:  Objection; outside the scope

22   of the designation.  You can answer.

1          THE WITNESS:  Yes, the federal government

2    carefully controls who does what in relation to an

3    aircraft.

4          MR. PALMINTIER:  Okay.  Chris, have you

5    been notified that the little status conference is

6    canceled?

7          MR. ODELL:  I don't know, I haven't been

8    checking my e-mail.  Let me look.  Have you?

9          MR. PALMINTIER:  It has.  I just wanted

10   to let you know.

11          MR. ODELL:  Okay.  I haven't received

12   anything, but.

13          MR. PALMINTIER:  It's off.

14   BY MR. PALMINTIER:

15       Q    In evaluating the product in question,

16   and I'm talking now about the specific serial number

17   353, is there -- were you able to find any history of

18   that particular ACM?

19          MR. ODELL:  Objection; form.

20          THE WITNESS:  Well, I was made aware of

21   the Shop Visit Report for 353 that is called Exhibit

22   4.

1    BY MR. PALMINTIER:

2         Q    Okay.  Do you know -- can you tell us

3    based on that historic review when that particular

4    serial number 353 was manufactured?

5         A    No, I cannot.  I have no records

6    indicating that.

7         Q    Who can tell us that?

8         A    I don't know that anybody can.

9         Q    Okay.  Can you tell us, again from an

10   historical standpoint in your research, where the

11   serial number occurs on this product?  And if you are

12   assisted by Exhibit 5 before you, the in globo

13   photographs, certainly feel free to look at that.

14        A    I'm sorry, can you repeat -- can you tell

15   us what?

16        Q    Yes.  Where would the serial number be

17   emblazed on the product?

18        A    Oh, it would be on the identification

19   plate.

20        Q    Okay.  In Exhibit 5 where is that

21   identification plate?

22        A    It is --

1      Q     If you look at the lower right hand --

2      A     Yeah, it is the larger --

3      Q     -- it's numbered --

4      A     I'm sorry.  It's the larger of the two

5  silver plates shown in the large diameter center of

6  the machine in the first photo.

7      Q     Understood.

8            Is it possible in the copy that you have

9  to read the serial number on Exhibit 5, 1343?

10     A     No, the decal is not there.

11     Q     Okay.  And none of the other pictures

12  show us that actual number; correct?

13     A     That is correct.

14     Q     Okay.  Would you be the person to ask

15  about who the previous owners were of the serial 353,

16  or would somebody else?

17     A     It would -- if anybody can help with that

18  it would be the product support director,

19  Mr. Francis.  I certainly don't.

20     Q     Okay.  Okay.  Do the company records

21  reveal on the Fairchild ACMs that are in circulation,

22  were in circulation at the time of this event in 2011

1    how an inspection for leakage of oil could take

2    place?

3              MR. ODELL:  Objection; outside the scope

4    of the designation.  You can answer.

5              THE WITNESS:  I'm not sure I understand

6    your question.  Do we have records that would show

7    that, or --

8    BY MR. PALMINTIER:

9         Q    Yes, yes.

10        A    I don't think you would need a record.

11   You would check the oil level.  It's a very simple

12   operation that's done routinely by aircraft

13   maintenance personnel.

14        Q    And if it were impossible to check that

15   oil level, you would agree with me that that was a

16   defect in the product; correct?

17             MR. ODELL:  Objection; form.

18             THE WITNESS:  It would be a poor design,

19   yes.

20   BY MR. PALMINTIER:

21        Q    Okay.  Well, again, I'm trying to stay

22   within the scope of your, the three items on the

1  list.  Let's say that a pilot or mechanic said that

2  the oil reserve, the reservoir was low.  What would

3  Fairchild have done about one of those Fairchild

4  designed and manufactured ACMs?

5          MR. ODELL:  Objection; form.

6          THE WITNESS:  If a pilot had said that a

7  oil reserve was low, then he would fill it with oil.

8  It takes two and a half tablespoonfuls of oil to fill

9  the unit.  It's not a lot of oil.

10 BY MR. PALMINTIER:

11     Q    Your testimony is that it was two and a

12 half tablespoons of oil in the subject ACM that we're

13 talking about?

14     A    That fills the BUR-20, yes.  Two and a

15 half tablespoonfuls of oil fill it, and you cannot

16 overfill it.  So, yes, there can be no more than two

17 and a half tablespoonfuls of oil in the unit.

18     Q    If we wanted a history of overhauls,

19 repairs, service, other things performed on the 353,

20 where would we look?

21          MR. ODELL:  Objection; form.

22          THE WITNESS:  The only person who might

1    have any information on that would be the product

2    support director.

3              MR. PALMINTIER:  Okay.  And I think we've

4    pretty much gotten to that point where we'll pick up

5    with him.  Give me two minutes here.

6              (Brief recess.)

7    BY MR. PALMINTIER:

8         Q    From the standpoint of the head of

9    engineering of FCC, Fairchild, whose responsibility

10   would it have been to retire one of their

11   manufactured ACMs; in other words, to say this

12   thing's had it, let's take it out of circulation?

13        A    That would never exist.  The only reason

14   a -- you mean a particular serial number, a single

15   unit?  The only reason it would be retired is if it

16   was beyond economical repair, or there was, it

17   would -- there's absolutely no reason, unless it's

18   beyond economical repair.

19        Q    Well, but whose responsibility would it

20   be, would it have been in 2011, for example, at the

21   time of this incident, to make that determination

22   that it's beyond economical repair?

1          A     That would come from the mechanic who

2     reviewed the condition of a particular machine, but

3     to my -- I have no -- I really don't have enough

4     knowledge to say that that ever happens.  I doubt

5     that it does.

6          Q     Okay.  You mentioned air bearings, and I

7     moved on before I forgot to ask you about ceramic

8     bearings.  These ceramic bearings came into use in

9     the ACMs in the 1980s, early '80s; correct?

10         A     They've been -- I used ceramic balls, but

11    they were oil-lubricated balls.

12         Q     Okay.  But one of the reasons why

13    ceramics were used is to improve safety and improve

14    performance; correct?

15         A     Not at all.  Not at all.  It has nothing

16    to do with safety.  Ceramic balls are used because

17    they offer longer life than metallic balls.  It has

18    absolutely nothing to do with safety.  It has no

19    implications for safety.

20         Q     Okay.  So longer life of the bearing has

21    no implication for safety?

22         A     No.  It has implications for reliability,

1    how long does the machine last.  A bearing's a

2    wear-out item.

3         Q    Understood.

4              But is it correct to say that no

5    wick-fed, oil-lubricated metallic bearings, you know,

6    the metallic bearings you've been talking about, were

7    still used after ceramics came along?

8         A    Oh, they certainly are used.  They're

9    used today.

10        Q    Understood.  I'm just getting information

11   from you.

12             So your testimony is that, especially

13   within ACMs such as those that we've been talking

14   about today, the BUR-20, et cetera, ceramics and

15   metal bearings were interchangeable, it wouldn't have

16   mattered?

17        A    It depends on the life requirements for

18   the unit.  The ceramic bearings are considerably more

19   expensive than high-grade metallic bearings.  The

20   highest grade you can buy is an M50 bearing, and

21   ceramics outlast them but they cost considerably

22   more.  If there's no reason to use ceramics for

1    extended life, then metallic bearings are used.

2              Indeed most -- I'd say virtually all,

3    except for a few commuter aircraft, used high-quality

4    steel bearings since -- they're still in use today in

5    oil-fed systems.

6         Q    Understood.

7              Remember earlier you were describing an

8    event in which the bearings failed and the unit would

9    produce, maybe for a second, an oil burn or a fume

10   event?

11             MR. ODELL:  Objection; form, misstates

12   the record.

13   BY MR. PALMINTIER:

14        Q    Did I misstate it?

15        A    It's a -- an air cycle machine will fail

16   very quickly.  It fails with the impellers, the

17   turbine and the compressor, interfering with their

18   shrouds.  It fails when the bearings basically

19   disintegrate, and it happens very rapidly and usually

20   results not in fumes but in liquid oil simply leaving

21   the unit.  It's allowed to leave because the seal

22   breaks apart once the bearing fails.

1       Q    Okay.  But one of the ways in which that

2  failure would occur would be the disintegration of

3  the bearings --

4       A    That's the --

5       Q    -- correct?

6       A    That is the number one reason why a

7  failure will occur.  They're wear-out items, and once

8  they wear they fail.

9       Q    And that would be one reason to use

10  ceramic, so you could avoid that kind of failure?

11      A    Not at all.  Ceramics fail the same way.

12      Q    Okay.  But as you've said, not as often;

13  correct?

14      A    No, I didn't say not as often.  I said

15  that they have longer life than even the highest

16  grade M50.  It depends on the application.  The

17  ceramic ball --

18      Q    Understood.

19      A    A ceramic ball could fail sooner if the

20  machine was running faster than a comparable steel

21  bearing supported unit.

22      Q    Yes.

1           MR. PALMINTIER:  I want to thank you very

2    much.  I will see you again when we take your expert

3    deposition.  Thank you very much.

4           THE WITNESS:  You're welcome, sir.

5           MR. ODELL:  I have just a couple of

6    follow-up questions, Mr. Dziorny.

7      EXAMINATION BY COUNSEL FOR DEFENDANT FAIRCHILD

8    BY MR. ODELL:

9      Q    You answered some questions from

10   Plaintiffs' counsel about a particular BUR-20 ACM

11   serial number 353.  Do you recall those questions?

12     A    Yes.

13     Q    Based on your review of Fairchild's

14   records, does Fairchild have any evidence that serial

15   number 353 was on the E690 EH Twin Commander on

16   May 31st, 2011?

17     A    I have no knowledge of that.

18     Q    I understand you have no knowledge of it.

19   Is there any information in the company's records?

20     A     Fairchild has, or Triumph has no

21   knowledge of that.  The company has no indication of

22   that.  We don't know what happens once we ship a

1     unit.

2          Q     And does Fairchild, or Triumph today,

3     have any information in its records indicating that a

4     Fairchild BUR-20 ACM of whatever serial number was

5     installed on the E690 EH aircraft on May 31st, 2011?

6          A     No, the company has no records indicating

7     that.

8          Q     Okay.  Have you heard that there may be

9     other manufacturers' ACMs that are compatible with

10    the Twin Commander 690A aircraft?

11         A     In reviewing records for this litigation,

12    yes, one of the Plaintiffs' witnesses, or -- I

13    believe it was John Probst said that there was an

14    alternate machine.

15         Q     Might it have been Don Hansen?

16         A     Yeah, or Mr. Hansen.  It's one of the

17    two, yes.

18         Q     Very early in the deposition you were

19    asked a question about whether all aircraft have

20    ACMs.  My understanding was that your testimony was

21    that, no, not all aircraft have ACMs; is that right?

22               MR. PALMINTIER:  Object to form.

1          THE WITNESS:  Well, not all aircraft have

2     ACMs, but that wasn't the question.  The question was

3     does an environmental control system necessitate an

4     ACM, and the answer is no.  It necessitates

5     pressurization, but that can be accomplished with a

6     valve.

7          MR. ODELL:  And I just wanted a

8     clarification on that.  I appreciate it.  That's all

9     the questions I have.

10    REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS

11    BY MR. PALMINTIER:

12         Q    Let me follow up quickly.  Your testimony

13    is that the records don't reveal one way or the other

14    whether the serial number 353 was used; correct?

15         A    Whether it was on the aircraft involved

16    in the incident; that's correct.

17         MR. PALMINTIER:  Thank you.  That's all I

18    have.

19         (Signature having not been waived, the

20    deposition of PAUL J. DZIORNY was concluded at 3:40

21    p.m.)

22

1   Notice Date: May 17, 2016

2   Deposition Date: May 5, 2016

3   Deponent: Paul J. Dziorny 30(b)(6)

4   Case Name: Kenneth and Jana Davidson v Rockwell

5   International, et al

6   Page:Line            Now Reads              Should Read

7   _____  _____  _____

8   _____  _____  _____

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

1     CERTIFICATE OF DEPONENT

2

3  I hereby certify that I have read and examined the

4  foregoing transcript, and the same is a true and

5  accurate record of the testimony given by me.

6  Any additions or corrections that I feel are

7  necessary, I will attach on a separate sheet of

8  paper to the original transcript.

9     _____

10      Signature of Deponent

11  I hereby certify that the individual representing

12  himself/herself to be the above-named individual,

13  appeared before me this _____ day of _____,

14  2016, and executed the above certificate in my

15  presence.

16     _____

17      NOTARY PUBLIC IN AND FOR

18

19     _____

20       County Name

21

22  MY COMMISSION EXPIRES:

```
 1

 2          CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 3

 4              I, Toni R. Thompson, RMR, Court Reporter,

 5      the officer before whom the foregoing proceedings was

 6      taken, do hereby certify that the foregoing transcript

 7      is a true and correct record of the proceedings; that

 8      said proceedings were taken by me stenographically and

 9      thereafter reduced to typewriting under my

10      supervision; and that I am neither counsel for,

11      related to, nor employed by any of the parties to this

12      case and have no interest, financial or otherwise, in

13      its outcome.

14              IN WITNESS WHEREOF, I have hereunto set my

15      hand and affixed my notarial seal this 16th day of May

16      2016.

17      My Commission Expires:

18          January 18, 2017

19

20

21      NOTARY PUBLIC IN AND FOR

22      THE STATE OF MARYLAND
```